OHIO SAVINGS ASSOCIATION, APPELLANT, *v.* BUSINESS FIRST OF COLUMBUS, INC. ET AL., APPELLEES.

(No. 87AP-610—Decided February 11, 1988.)

*Roy E. Lachman,* for appellant.

*Vorys, Sater, Seymour & Pease, C. William O'Neill, Richard D. Schuster* and *Robert N. Webner,* for appellees.

REILLY, J. This is an appeal from a judgment of the Franklin County Court of Common Pleas.

This action arises from a front-page article printed in Business First, Volume 1, No. 31, the week of April 15, 1985, which was circulated to subscribers and newsstand purchasers of the newspaper in Columbus and elsewhere. Business First is a weekly business newspaper which focuses on providing business and economic news analysis.

The article in dispute was written by defendant Mark Heschmeyer, an employee of Business First of Columbus, Inc. The headline read: "Five federal thrifts near insolvency — Reports paint grim picture of weak industry." The trial court precisely analyzed the article:

"* * * Ohio Savings is mentioned twice by name. The body of the article makes three points relevant to Plaintiff. The first point concerns the booking of goodwill as an asset. Quoting sources, the article states that the inclusion of goodwill in assets, while in conformity with accepted accounting practice, was the subject of controversy. The second point made by the article is that as of September 1984, Plaintiff had a reported regulatory net worth of $59.32 million which included $44.22 million of goodwill. The third point is that if this 'goodwill' were not included on its balance sheet Plaintiff would be 'near insolvency' or would have 'just barely enough assets to cover their [sic] liabilities.' "

Defendants allege that the above-stated figures were derived from the Quarterly Financial Report for Ohio Savings Association, which contained financial information for the third quarter ending September 1984. The Federal Home Loan Bank Board (hereinafter "FHLBB") supplied the information to Heschmeyer, pursuant to a Freedom of Information Act request.

After publication of the article, a number of depositors apparently withdrew large sums of money from the institution. Plaintiff requested a correction, pursuant to R.C. 2739.13 et seq. Defendants refused plaintiff's request.

Subsequently, plaintiff filed suit against defendants alleging that it had been libeled by defendants. The complaint also alleged a violation of R.C. 1155.21, which prohibits the circulation of false statements or rumors about a savings and loan association. Thereafter, plaintiff filed an amended complaint also alleging that defendants violated R.C. 2739.13 et seq. for failing to correct the false statements. Plaintiff further alleged false light invasion of privacy. The trial court granted summary judgment to defendants on all counts.

Plaintiff has timely filed a notice of appeal, including the following assignments of error:

"I. The trial court erred in granting Defendants' Motion for Summary Judgment on the libel claims by deciding issues of material fact and by misapplying the legal standard of 'opinion.'

"II. The trial court erred in granting Defendants' Motion for Summary Judgment on Ohio Savings' statutory claim based on O.R.C. § 1155.21.

"III. The trial court erred in granting Defendants' Motion for Summary Judgment on Ohio Savings' statutory claim based on O.R.C. §§ 2739.13 et seq.

"IV. The trial court erred in granting Defendants' Motion to Dismiss Count IV of the Amended Complaint concerning false light invasion of privacy."

In determining whether the trial court erred in sustaining defendants' motion for summary judgment, Civ. R. 56(C) provides:

"* * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor. * * *"

It is noteworthy that the Ohio Supreme Court in *Grau* v. *Kleinschmidt* (1987), 31 Ohio St. 3d 84, 90,

31 OBR 250, 255, 509 N.E. 2d 399, 404, stated that "* * * summary judgment procedures 'are especially appropriate in the First Amendment area' * * *," quoting *Dupler* v. *Mansfield Journal* (1980), 64 Ohio St. 2d 116, 120, 18 O.O. 3d 354, 357, 413 N.E. 2d 1187, 1191.

As to the first assignment of error, plaintiff argues that there are genuine issues of material fact concerning the alleged falsity of defendants' publication. It is significant that the elements of an action for defamation are as follows: (1) a statement of fact; (2) the statement is false; (3) the statement has a defamatory meaning; (4) the statement is published; and (5) the defendant is guilty of some degree of fault. See *Hersch* v. *E. W. Scripps Co.* (1981), 3 Ohio App. 3d 367, 3 OBR 430, 445 N.E. 2d 670.

The trial court held essentially that, as a matter of law, all of the factual statements in the article are true, and that the other statements pertaining to plaintiff are constitutionally protected assertions of opinion. It is undisputed that plaintiff is a Cleveland-based institution. The other factual statements are contained in paragraph thirty-four of the article, which states that:

"Ohio Savings, the largest savings and loan represented in the area, posted total assets of $1.6 billion, of which $44.22 million was listed under goodwill. It posted regulatory net worth of $59.32 million or 3.7 percent of assets. Subtracting goodwill, Ohio Savings' tangible net worth fell to 0.9 percent."

Plaintiff does not contest the accuracy of the calculations or that the figures are based upon statistical summaries contained in the September 1984 figures released by FHLBB. In fact, an Ohio Savings officer stated that the figures are accurate.

The basis of plaintiff's argument as to falsity is twofold. First, plaintiff maintains that more recent figures were available to defendants; therefore, plaintiff contends that defendants materially underestimated plaintiff's regulatory net worth and tangible net worth. Plaintiff also maintains that there is a material dispute as to whether a controversy exists over including goodwill as an asset.

The article expressly provides that the author relied upon financial information "* * * supplied by Federal Home Loan Bank Board. The figures are as of last September [1984], the most current released by the federal regulatory agency." There is no indication that more recent information was available to defendants. Plaintiff's president, Robert Goldsberg, testified that he did not know whether defendants could have acquired more timely information from the FHLBB.

Plaintiff argues that a genuine issue of material fact was raised to the extent that Goldsberg testified based upon an "information and belief" statement that fourth quarter information for 1984 was indeed available to defendants. Goldsberg's statement, however, was speculative and not predicated upon personal knowledge, and did not raise a genuine issue of material fact. See Civ. R. 56(C) and *Olverson* v. *Butler* (1975), 45 Ohio App. 2d 9, 12, 74 O.O. 2d 11, 13, 340 N.E. 2d 436, 438. Hence, there is no evidence upon which a genuine issue of material fact is raised other than uncontroverted evidence that the Quarterly Financial Report for Ohio Savings supplied by FHLBB was the most current information available to defendants.

Plaintiff also contends that there is a disputed question of fact as to whether there is a controversy regarding the inclusion of goodwill in determining an institution's assets and regulatory net worth. Nevertheless, the statement by Frank Ventura, Vice

President of T.J. Holt & Co., supports the controversial nature of the goodwill-accounting principle:

" 'It has been accepted by the Federal Home Loan Bank as an acceptable accounting principle' * * *. 'It is the subject of a great deal of controversy. Basically, you don't have anything.' "

The article further states that despite the controversial nature of carrying goodwill as an asset, " '(goodwill) is carried as an asset and it really is an asset' * * *. 'I don't see any negative results from it other than the fact that it impacts earnings,' " quoting the president of one savings and loan institution. At any rate, even if it is disputed as to whether the accounting principle is controversial, such dispute is not material since the statement does not pertain to plaintiff nor is it defamatory; therefore, it is not actionable. Hence, for purposes of summary judgment, the trial court did not err in finding that the aforementioned statements of fact are both accurate and true.

Plaintiff also contends that the trial court erred in its determination that the remaining statements in question are constitutionally protected assertions of opinion. These statements are the headline which states that five federal thrifts were "near insolvency," paragraph two which states that "[t]hree other thrifts border on having almost no equity or net worth * * *," and paragraph seven which states that plaintiff has "just barely enough assets to cover their [sic] liabilities * * *."

The issue is whether the trial court erred in finding that the abovementioned statements are constitutionally protected opinion and, consequently, are not actionable. See *Gertz* v. *Robert Welch, Inc.* (1974), 418 U.S. 323, 339-343; *Scott* v. *News-Herald* (1986), 25 Ohio St. 3d 243, 25 OBR 302, 496 N.E. 2d 699. The determination concerning whether the statements are factual or constitutionally protected opinion is a matter of law for the court. The Supreme Court in *Scott* set forth a four-factor, fact-opinion determination test, wherein the court stated:

"* * * First is the specific language used, second is whether the statement is verifiable, third is the general context of the statement and fourth is the broader context in which the statement appeared. * * *" *Id.* at 250, 25 OBR at 308, 496 N.E. 2d at 706.

For the following reasons, this court concurs with the trial court's finding that the aforementioned statements are constitutionally protected assertions of opinion and therefore are not actionable.

As to the first factor of the *Scott* test, concerning the "specific language used," the statements encompass expressly stated calculations set forth in paragraph thirty-four of the article based upon financial information supplied by FHLBB. Despite plaintiff's assertions to the contrary, the article does not state or imply that plaintiff is insolvent, but, rather, that plaintiff is "near insolvency," which is a critical distinction. The phrase "near insolvency," as used in the headline, must be construed in the context of the entire article. *Painter* v. *E. W. Scripps Co.* (1957), 104 Ohio App. 237, 4 O.O. 2d 388, 148 N.E. 2d 503.

The commonly understood meaning of "insolvency" is defined as total liabilities exceeding total assets. The specific language in the article does not state, nor is there any implication, that plaintiff's liabilities exceed its assets. Thus, the term "insolvency" is an objective standard and capable of precise definition by objective criteria. When the word "insolvency" is combined with "near," the entire meaning of the phrase becomes subjective and suffi-

ciently nebulous as to elude objective or precise definition.[1]

Therefore, the phrase "near insolvency" is the opinion of the writer drawn from expressly stated accurate facts derived from a discernible source. The same rationale applies to the other operative phrases, "*border*[s] on * * * *almost* no equity" and "just *barely* enough assets," as such phrases contain equally subjective terms incapable of precise definition or generally understood meaning. (Emphasis added.) The phrases indicate to the reader that they are the writer's conclusions predicated upon articulated facts set forth in the article.

As to the second factor of the *Scott* test, the above discussion emphasizes that the statements are incapable of verification as none of the comments is "objectively capable of proof or disproof." *Ollman* v. *Evans* (C.A.D.C. 1984), 750 F. 2d 970, 981, certiorari denied (1985), 471 U.S. 1127. For instance, if the writer had stated that plaintiff was insolvent or that its liabilities exceeded its assets, such statements would have been verifiable by various methods. The statements in the article, however, are not verifiable since, regardless of the financial information available, one cannot verify whether an institution is near insolvency or barely has sufficient assets to cover its liabilities. Such statements of opinion, although subject to scrutiny in the marketplace of ideas, are nonverifiable and express the writer's subjective viewpoint.

As to the third factor of the *Scott* test, the disputed statements, in the context of the entire article, are based upon nondefamatory disclosed facts provided by FHLBB. The opinion statements of the writer are not based upon unstated, defamatory facts, but rather are predicated upon calculations concerning tangible net worth derived from financial information supplied by FHLBB for the third quarter of 1984.

The lead paragraph puts the reader on notice that the subsequent discussion is predicated upon an examination of a controversial accounting "method," which was subsequently depicted in the article as well-accepted by regulators. Thereafter, the article relates that the "* * * deputy director of the office of economic policy for the Federal Home Loan Bank in Washington, D.C., explained that not only is the method accepted by regulators but is considered a bona fide method by professional accountants." The article definitely discloses that the inclusion of goodwill in net worth calculations is a bona fide method and is well-accepted but, nonetheless, controversial. The author calculates tangible net worth by deducting goodwill from regulatory net worth as a means of analyzing the financial health and stability of savings and loan institutions.

The article does not state nor can it reasonably be inferred that plaintiff was insolvent; that plaintiff improperly included goodwill as an asset; or that the exclusion of goodwill from assets would render plaintiff insolvent. Instead, based on such calculations, the author speculated that plaintiff was near or bordered on insolvency utilizing a tangible net worth analysis as opposed to a regulatory net worth analysis. The article clearly states that a savings and loan institution has "supervisory problems" if its regulatory net worth falls below three percent of assets. The article expressly stated that plaintiff's regulatory worth was 3.7 percent of assets.

Considering the fourth factor of

---

[1] The phrase "near insolvency" is as subjective as the headline had it stated that Ohio Savings was "practically," "approaching," or "close to" insolvency.

the *Scott* test, which calls for an examination of the "broader context of the alleged defamatory remark," the article appeared in a weekly business newspaper in contrast to a daily newspaper. The focus was industry-wide. The author provided a method of assessing the financial viability of a savings and loan financial institution through various net worth calculations. The potential contrast in style, tone, timeliness, and topic selection between a business weekly, such as Business First, and a daily newspaper is evident in this case.

A reading of the entire article informs the reader that the author is analyzing the present competing views regarding the significance of goodwill in net worth calculations as they relate to regulatory requirements and a savings and loan institution's financial condition. The article was written at the time of the Home State Savings crisis when there was a heightened and growing public concern about the financial health of such institutions. Hence, it addressed a matter of substantial public importance. In considering the four-factor *Scott* test from the totality of the circumstances, this court finds that the aforementioned statements are constitutionally protected assertions of opinion.

For the foregoing reasons, plaintiff's first assignment of error is not well-taken.

The second and third assignments of error are interrelated to the extent that plaintiff's claims are predicated upon alleged statutory violations of R.C. 1155.21 and 2739.13. Plaintiff contends that such violations provide a civil cause of action for monetary damages.

This court finds that the trial court properly granted summary judgment for defendants on plaintiff's claim under R.C. 1155.21, which is a criminal statute and includes criminal sanctions in the following circumstances:

"(A) A person may not purposely or knowingly make, circulate, send, cause, aid, procure, or permit to be made, circulated, or sent any false statement about a savings and loan association.

"(B) In this section, 'false statement' includes any untrue statement or rumor, produced in any manner, that:

"(1) Is directly or by inference derogatory to the financial condition of a savings and loan association;

"(2) Affects the solvency or financial standing of an association; or

"(3) Is calculated to injure the reputation or business of an association.

"(C) Any person who violates this section is guilty of a misdemeanor of the first degree."

The term "false statement" as set forth in R.C. 1155.21 applies to a false statement or rumor not encompassing constitutionally protected assertions of opinion. See R.C. 1.47(A). Plaintiff contends that the trial court did not recognize that a "false statement" is also defined by the statute to include a rumor of a defamatory nature. Webster's Seventh New Collegiate Dictionary (1973), however, defines "rumor" as:

"* * * [T]alk or opinion widely disseminated with no discernible source: *Hearsay* 2: a statement or report current without known authority for its truth * * *."

The factual statements in the article, as the trial court found, are both accurate and true. Such statements are based upon a discernible source containing verifiable figures supplied by FHLBB, and therefore cannot be considered to fall within the meaning of "rumor" as set forth in R.C. 1155.21. As discussed in the first assignment of error, as a matter of law, no false statements were published. The other statements found to be constitutionally protected asser-

tions of opinion cannot be considered to be "rumor" as included in R.C. 1155.21. See R.C. 1.47(A). See, also, *National Labor Relations Bd.* v. *Catholic Bishop of Chicago* (1979), 440 U.S. 490, 500.

The trial court also correctly granted summary judgment for defendants on plaintiff's claim brought under R.C. 2739.13 *et seq.* For the reasons set forth in the disposition of the first assignment of error and in the discussion finding no violation of R.C. 1155.21, we find as a matter of law that defendants did not print false statements of fact or circulate rumors about plaintiff. Thus, defendants properly refused plaintiff's request for a published statement of correction.

Plaintiff's second and third assignments of error are not well-taken.

As to the fourth assignment of error, the trial court correctly dismissed plaintiff's false light invasion of privacy claim because Ohio has not recognized such a claim. See *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369, 6 OBR 421, 453 N.E. 2d 666. The *Yeager* decision has been followed by this court as well. See *Killilea* v. *Sears, Roebuck & Co.* (1985), 27 Ohio App. 3d 163, 27 OBR 196, 499 N.E. 2d 1291.

Hence, the fourth assignment of error is not well-taken.

Plaintiff's assignments of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

STRAUSBAUGH, P.J., and WHITE-SIDE, J., concur.